UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

YASSAR J. LINARES,
MIGUEL A. ALBERIO,
MARIO CORRALES, and
OSCAR GARRIDO,

              Defendants.

------------------------------------X

10 Cr. 996-01 (RWS)

SENTENCING OPINION



**Sweet, D.J.**

      On March 1, 2011, Yassar Linares ("Linares" or "Defendant") pleaded guilty to one count of conspiracy to commit an armed robbery of a person suspected of possessing narcotics, in violation of 18 U.S.C. § 1951, and one count of using and carrying a firearm during and in relation to a robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(i). For the reasons set forth below, Linares will be sentenced to 70 months' imprisonment to be followed by 3 years' supervised release. Linares will also be required to pay a special assessment of $200 and to forfeit all property constituting or derived from any proceeds he obtained from the instant offenses.

1

## Prior Proceedings

On October 21, 2010, Indictment 09 CR 996 (RWS) was filed in the Southern District of New York. Count One charges that from June 2010 to September 23, 2010, in the Southern District of New York and elsewhere, Linares, Miguel A. Alberio, a/k/a "Erwin DeJesus," a/k/a "Miguel Alberto" ("Alberio"), Mario Corrales ("Corrales"), Oscar Garrido, a/k/a "Oscar Garcia" ("Garrido"), and others conspired to commit an armed robbery of a person suspected of possessing narcotics in an apartment in Bronx, New York, in violation of 18 U.S.C. § 1951. Count Two charges that on September 23, 2010, in the Southern District of New York, the defendants, during and in the course of the robbery conspiracy, used, carried, possessed, and aided and abetted the use, carrying, and possession of firearms, 18 U.S.C. § 924(c)(1)(A)(i). Count Three charges that from at least June 2010 to September 23, 2010, in the Southern District of New York and elsewhere, the defendants and others conspired to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 846.

On March 1, 2011, Linares appeared before the

Honorable Michael H. Dolinger and allocated to Counts One and Two only. In accordance with a plea agreement, the parties stipulated to the following:

Count 1

- Pursuant to § 2B3.1(a), the base offense level is 20;
- Pursuant to § 2B3.1(b)(6), a one-level increase is warranted because the object of the robbery was to take a controlled substance;
- Pursuant to § 3E1.1(a) and (b), a three-level decrease is warranted because the defendant accepts responsibility for his actions, and he pleaded guilty in a timely manner, thereby permitting the government to avoid preparing for trial;
- In accordance with the above, the applicable offense level is 18.

Count 2

- Pursuant to § 2K2.4(b), the guidelines sentence for Count 2 is 60 months' imprisonment, to run consecutively to any sentence resulting from Count 1;
- The defendant's Criminal History Category is I;

- Based upon an adjusted offense level of 18 and a Criminal History Category of I, the sentencing guidelines range on Count 1 is 27 to 33 months' imprisonment. The range is increased by a mandatory consecutive sentence of 60 months' imprisonment on Count 2. Accordingly, the guidelines range is 87 to 93 months' imprisonment. In addition, the fine range is $6,000 to $60,000;

- The parties agree that neither a downward nor an upward departure from the stipulated guidelines range is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines. Nor will either party suggest that the Probation Officer consider such a departure or adjustment under the Guidelines or suggest that the Court sua sponte consider any such departure or adjustment;

- The parties agree that either party may seek a sentence outside of the guidelines range, suggest that the Probation Office consider a sentence outside of the stipulated guidelines range, and suggest that the Court sua sponte consider a sentence outside of the stipulated range, based upon the factors to be

4

considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

Linares' sentencing is currently scheduled for January 23, 2012.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

    (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)   the need for the sentence imposed —

        (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)   to afford adequate deterrence to criminal conduct;

        (C)   to protect the public from further crimes of the defendant; and

5

        (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range established for —

        (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5)   any pertinent policy statement . . . [issued by the Sentencing Commission];

(6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. <u>See</u> <u>Crosby</u>, 397 F.3d at 114-15.


## The Defendant


The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Linares' personal and family history.

6

**The Offense Conduct**

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that report. The information contained therein is based on an investigation conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

Between June 2010 and August 2010, Linares engaged in several telephone calls for the purpose of arranging the robbery of a cocaine courier who agreed to participate in a staged robbery of the cocaine he was transporting in exchange for a portion of the cocaine. Linares was not aware that an undercover agent ("UC") was posing as the cocaine courier. Some telephone calls were with Linares and the UC while other calls were with Linares and a confidential informant ("CI-1"). Most of the calls with Linares were consensually recorded and at times during the conversations they spoke in a coded language.

On June 11, 2010, CI-1 had a telephone conversation with Linares, who was in North Carolina, about the staged robbery. During this conversation, Linares agreed to partake in

7

the robbery of between 15 and 20 kilograms of cocaine. Linares told CI-1 that he knew individuals who could help with the robbery. CI-1 told Linares that the narcotics might be hidden in traps inside furniture used to store narcotics. Linares asked CI-1 if he (CI-1) could sell the narcotics in Bronx, NY, so that he (Linares) could take money instead of narcotics when he returned to his residence. Linares made a reference to "bust[ing] something with his little brother like 2-3 weeks ago," which agents interpreted as Linares' commission of a similar crime.

On July 13, 2010, CI-1 had a telephone conversation with Linares and they discussed whether they would meet in New York or somewhere near Linares' residence in North Carolina to discuss the robbery.

On July 14, 2010, CI-1 had a telephone conversation with Linares and they discussed where they would meet to so that they could discuss the robbery. The CI-1 stated that he communicated with the UC who told CI-1 that the narcotics were being transported in an attempt to reduce the risk of them being stolen. During the conversation, CI-1 told Linares, "If you can't do it [the robbery], just let me know. I won't-I'm not

gonna push it." Linares responded, "I need it, do . . . It's a done deal . . . ."

On July 28, 2010, the UC had a telephone conversation with Linares to make arrangements to meet so that they could discuss the robbery and when the UC expected the arrival of the narcotics. The UC did not want the robbers to be from his neighborhood. Linares suggested recruiting his uncle and other individuals to assist him in stealing the narcotics. The UC asked if Linares and his co-conspirators would "bring the heat," (firearms), and Linares responded, "if . . . we gotta bring out own, you know, 'equipment' to work with, that's fine . . . ." which was believed to reference to firearms. The UC stated that it might be difficult to obtain firearms in New York.

On August 5, 2010, the UC, CI-1, Linares, and a co-conspirator ("CC-1") met in a restaurant located in Charlotte, NC, to plan the robbery. Some of the conversations, which were in Spanish and English, included the following:

- During the meeting, the UC stated that he did not want to place more than 15 kilograms in his car because the trap in the car only held 15 kilos. The CC-1 commented that there

might be "more" narcotics than what was known to the UC.
Linares agreed that there could be more narcotics in the
apartment where the drugs were stored, and he suggested
that individuals in the apartment would have to be
restrained and thoroughly checked.

- Linares made reference to a previous robbery that he
  committed which resulted in him being chased for 40
  minutes, changing his license plate, and passing red
  lights.

- Linares, CC-1 and the UC discussed what they would do once
  they obtained the narcotics.   Linares stated, "in this
  city, it goes for about $28,000," which agents interpreted
  as the price per kilogram of cocaine in Charlotte, NC.
  They also discussed how long it would take for Linares and
  his co-conspirators to travel to New York for which Linares
  stated that he could be available in 24 hours.


On September 23, 2010, the UC and the CI met with
Linares, Alberio, Corrales, and Garrido at a restaurant located
in Bronx, NY to plan the robbery.  The UC noticed that Corrales
was armed with a firearm and signaled to another undercover
officer in the restaurant that Corrales possessed a firearm.
The following was discussed during the meeting:

- Alberio told the UC that they engaged in a robbery in the past. Alberio indicated that he did not want to be in the location where the narcotics were located for several minutes "cracking," which agents believe to refer to hitting individuals who were in the room where the narcotics were stored. Alberio was concerned that the narcotics customers were "geared up" (carrying firearms). Garrido suggested that the UC contact them to tell them how many individuals were in the apartment where the narcotics were stored and provide a layout of the apartment. The defendants indicated that prior to the meeting with UC and CI-1, they discussed how the robbery would be committed.

- The defendants also discussed how they planned to take the narcotics from the UC. Alberio proposed two ways they would commit the robbery and requested that the UC indicate how they would take the narcotics from him. As part of the robbery, Corrales volunteered to "hit" the UC and Garrido indicated the same. Corrales remarked that when the UC open the door that he (Corrales) would "lay him down." Linares suggested that anyone inside the apartment should be restrained.

- Alberio suggested that he could obtain a "taser" and

Linares asked if they could get a taser. Alberio told the UC that they wanted to use their own cars because they had everything they needed in their car. Garrido warned about "lookouts" being at the building where the narcotics were. Linares asked the UC to provide a layout of the building.

- Alberio asked if the UC would be carrying a firearm and proposed that they "disarm" the UC during the planned robbery. Alberio indicated that they were "carrying a lot of fuckin' heat."

- The defendants also discussed how they planned to divide the narcotics. The UC expected that there would be 15 "birds" (15 kilograms of cocaine). Alberio and Corrales proposed that the cocaine would be evenly divided amongst them.

Following the September 23, 2010, meeting, the defendants left the restaurant and were arrested. Upon Corrales' arrest, he was in possession of a Ruger .45 caliber located in the waistband of his pants. On the same date, after AFT agents completed an inventory search of a grey, Chevrolet Tahoe which had a North Carolina license plate used by the defendants, the following items were recovered from the vehicle:

- Three cell phones;

- Under the rear driver's side floorboard, a Smith & Wesson .40 caliber semiautomatic pistol, with a magazine loaded with 14 .40 caliber rounds, and a pair of brown work gloves;

- Under the rear seat, in the middle part of the floorboard, a Ruger magazine loaded with seven .45 caliber rounds, which appeared to fit the firearm that Corrales possessed;

- Under the rear passenger side floorboard, a Smith & Wesson .357 revolver loaded with six .357 rounds;

- A pair of brown work gloves in the glove compartment.

According to the Government, the defendants are equally culpable for their involvement in the instant offense.

## The Relevant Statutory Provisions

For Count One, pursuant to 18 U.S.C. § 1951, the maximum term of imprisonment is 20 years. Pursuant to 18 U.S.C. § 924(c)(1)(A)(i), Count Two carries a mandatory term of 60 months' imprisonment, which must be imposed to run consecutively to any other term of imprisonment that is imposed.

For Count One, if a sentence of imprisonment is imposed, the Court may impose a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2). For Count Two, if a sentence of imprisonment is imposed, the Court may impose a term of supervised release of not more than 5 years, pursuant to 18 U.S.C. § 3583(b)(1). Multiple terms of supervised release are to run concurrently with each other, pursuant to 18 U.S.C. § 3624(e).

For Count One, the Defendant is not eligible for probation because he is being sentenced at the same time to a term of imprisonment on a different count or case, pursuant to 18 U.S.C. § 3561(a)(3). For Count Two, the Defendant is not eligible for probation because the instant offense is a Class A felony, pursuant to 18 U.S.C. § 3561(a)(1).

For both Counts, the maximum fine is $250,000 per count, pursuant to 18 U.S.C. § 3571. A special assessment of $100 per count is mandatory, pursuant to 18 U.S.C. § 3013.

Pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461, Defendant shall forfeit to the United States all property, real and personal, involved in the offense or traceable to such

14

property.

**The Guidelines**

The November 1, 2011 edition of the United States
Sentencing Commission Guidelines Manual has been used in this
case for calculation purposes, pursuant to § 1B1.11(a). The
Court finds the following with respect to Defendant's applicable
offense level, criminal history, recognition of responsibility,
and term of imprisonment:

The Guideline for the violation of 18 U.S.C. § 1951 is
found in § 2B3.1, which provides for a base offense level of 20,
pursuant to § 2B3.1(a).

Because the object of the robbery was to take a
controlled substance, a one-level increase in offense level is
warranted, pursuant to § 2B3.1(b)(6).

Based on his plea allocution, Defendant has shown
recognition of his responsibility for the offense. Pursuant to
§ 3E1.1(a), the offense is reduced two levels. Furthermore, an
additional one-level reduction is warranted, pursuant to

§ 3E1.1(b), because Defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Accordingly, the applicable offense level is 18.

On September 7, 1997, Linares was arrested and charged with Loitering. On September 9, 1997, the Eleventh Circuit Court in Miami, Florida sentenced Linares to credit time served (one day). Pursuant to § 4A1.2(c)(1), this conviction warrants zero criminal history points.

On March 9, 1998, Linares was arrested and charged with Larceny and Grand Theft in the Third Degree. On August 7, 1998, the Eleventh Circuit Court in Miami, Florida sentenced Linares to withheld adjudication, one-year probation to include 75 hours' community service, $149 restitution and costs. On August 13, 1998, Linares' probation was modified to include the completion of a theft course and 25 hours' community service. Pursuant to § 4A1.2(e)(3), this conviction warrants zero criminal history points.

On March 11, 2002, Linares was arrested and charged with one count of disorderly conduct, one count of battery on law enforcement, and one count of possession of cocaine. On October 4, 2002, Linares pleaded nolo contendere and was sentenced to withheld adjudication of guilt with a suspended sentence on count one and withheld adjudication of guilt on counts two and three and placed on probation for two years to run concurrently. Pursuant to § 4A1.2(e)(2) & § 4A1.1(c), this conviction warrants one criminal history point.

On May 24, 2004, Linares was arrested and charged with driving under the influence. On March 12, 2005, Linares pleaded nolo contendere, guilty, and sentenced to a rehabilitation program. Pursuant to § 4A1.2 Application Note 5 & § 4A1.1(c), this conviction warrants one criminal history point.

The criminal convictions above result in a criminal history score of two. A total of two criminal history points establishes a Criminal History Category of II, pursuant to the table at Chapter 5, Part A, of the Guidelines.

Based on a total offense level of 18 and a Criminal History Category of II, the Guidelines range for imprisonment is

30 to 37 months. In addition, a violation of 18 U.S.C. § 924(c)(1)(A)(i) requires a mandatory term of 60 months' imprisonment, which must be imposed to run consecutively to any other term imposed.

The Guidelines range for a term of supervised release is at least three years but not more than five years, pursuant to § 5D1.2(a)(1).

Defendant is not eligible for probation because the instant offense is a Class A felony, pursuant to § 5B1.1(b)(1).

The fine range for the instant offenses is $6,000 to $60,000, pursuant to § 5E1.2(c)(3)(A) and (c)(3)(B). Subject to Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,270.93 to be used for imprisonment, a monthly cost of $317.32 for supervision, and a monthly cost of $2,063.19 for community confinement.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a downward departure from the Guidelines sentence is warranted in the instant case.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant."

Linares is married and the father of four children. He appears to be a devoted husband and father whose

incarceration will be a severe hardship for both his children and his spouse. Prior to the instant offense, Linares worked a number of jobs and started a small business with his wife, Diana Hernandez-Linares. It appears that the economic downturn, and the impact that it had on the Defendant's family, contributed to his decision to engage in criminal conduct. Linares' last contact with the criminal justice system was a DUI six years prior to the instant offense, to which he entered a plea of nolo contendere. This indicates that the Guidelines criminal history score may overstate the risk that the Defendant will re-offend. The Court is additionally mindful that while the Defendant engaged in a serious criminal conspiracy, according to the PSR, no damage was yet done to any party.

Under 18 U.S.C. § 3553(a)(6), the Court further considers "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Defendant Alberio was sentenced to 70 months' imprisonment, Defendant Corrales to 80 months' imprisonment, and Defendant Garrido to 65 months' imprisonment -- all downward departures. According to the Government, the defendants are equally culpable for their involvement in the instant offense.

The Court notes that Linares has accepted responsibility for his conduct. In light of the nature and circumstances of the offense and history and characteristics of the Defendant as well as the need to avoid unwarranted sentence disparities among defendants, the Court finds that a downward departure from the Guideline sentence is appropriate to impose a sentence "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a).

**The Sentence**

For the instant offenses, Linares will be sentenced to 70 months' imprisonment and 3 years' supervised release.

Linares is directed to report to the nearest United States Probation Office within seventy-two hours of release from custody to commence his term of supervised release. It is recommended that Linares be supervised by the district of his residence.

As mandatory conditions of his supervised release, Linares shall: (1) not commit another federal, state, or local

crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) refrain from any unlawful use of a controlled substance; (5) submit to one drug test within fifteen (15) days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer; and (6) cooperate in the collection of DNA as directed by the probation officer.

The standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions that:

(1) Defendant shall obey the immigration laws and comply with the directives of immigration authorities.

(2) Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation.

Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that Defendant is able to pay a fine, and so the fine in this case shall be waived. A special assessment of $200, payable to the United States, is mandatory and shall be due immediately.

Defendant shall forfeit to the United States all property, real and personal, involved in the offense, traceable to such property, or representing any proceeds he obtained directly or indirectly from the offense.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for January 23, 2011.

It is so ordered.

New York, NY
January  / 𝒿 , 2012

ROBERT W. SWEET
U.S.D.J.

23